**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Sonia Yamileth Reyes Arauz, ) | |
| ) | Case No. 26-cv-10316-IT |
| Petitioner, ) | |
| v. ) | |
| ) | |
| David WESLING, Field Office Director, ) | |
| TODD LYONS, Acting Director U.S. ) | |
| Immigrations and Customs Enforcement, ) | Agency Number: 098-935-412 |
| and KRISTI NOEM, U.S. Secretary ) | |
| of Homeland Security, ) | |
| ) | |
| Respondents. ) | |
| ) | |

## REPLY IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Sonia Yamileth Reyes Arauz ("Petitioner" or "Ms. Reyes") respectfully

submits this reply in support of her Petition for a Writ of Habeas Corpus. For the reasons set

forth below and in Ms. Reyes's accompanying Declaration and declaration of counsel, Petitioner

respectfully requests that the Court grant the Petition and order her immediate release from

custody.[1]

### I. FACTUAL BACKGROUND

Ms. Reyes is a 47-year-old mother from Honduras. Reyes Decl. at para. 1. Beginning at

age 5 or 6, Ms. Reyes was continually raped and physically abused by her stepfather in

Honduras. *Id.* at para. 2. He would light cigarettes and burn Ms. Reyes, and he locked her and

her sister in a room, threatening to kill them if they reported him. *Id.*  After enduring years of

---

[1] Respondents mischaracterize a segment of the Petition as alleging that Petitioner's "detention without a bond hearing violates due process." Resp. Opp. at 2. In fact, Respondent is seeking immediate release not a bond hearing based on Respondents' substantive and procedural due process violations described *infra* and in the accompanying declarations.

abuse, Ms. Reyes's mother went to the police numerous times to submit complaints regarding the stepfather's treatment of her children, but the police never did anything to stop the abuse. *Id.* at para. 3. By the age of 13, having endured a horrific childhood filled with unimaginable abuse, Ms. Reyes ran away from home. *Id.* at para. 4. Even after she fled his house, Ms. Reyes' stepfather continued to make threats, saying she would always be his woman, that he was going to lock her up and do whatever he wanted to her. *Id.* Ms. Reyes eventually fled to the United States for protection. *Id.*

She was detained after entering the United States and taken to a detention center. *Id.* at para. 5. There, immigration officials requested the name and address for the person she was going to stay with, in this case her aunt in Boston, MA. *Id.* She gave the officers her aunt's phone number and believed officers had spoken with her family to retrieve the correct address. *Id.* Upon release, officers told her that a notice of hearing would arrive at her aunt's house in Boston. *Id.* at para. 6. However, no notice ever arrived and the Immigration Court entered an order of removal in absentia. Resp. Opp., Exhibit 2.

In November 2009, Ms. Reyes was arrested during a traffic stop and subsequently detained by Immigration and Customs Enforcement ("ICE") officers. Reyes Decl. at para. 7. She was not provided a list of attorneys and was told that she had no rights to speak with anyone about her case or to see a judge. *Id.* She was deported on January 15, 2010. Resp. Opp., Exhibit 1. Ms. Reyes subsequently returned to the United States, once again seeking protection. Reyes Decl. at para. 8.

Ms. Reyes built a life here and put her energy into raising her children. Her son has a severe mental illness and up until her detention, she has been his main caretaker. *Id.* at 9. On September 9, 2025, Ms. Reyes was detained by ICE officers in her hometown in Connecticut. *Id.*

2

at 11. She was transferred from Connecticut to Rhode Island, and eventually ended up in the Cumberland County Jail ("CCJ") in Portland, Maine. *Id.* After voicing a fear of returning to Honduras, Ms. Reyes was scheduled for a Reasonable Fear Interview. *Id.* at 12. The interview was conducted with assistance from a male interpreter, which proved to be difficult for Ms. Reyes, especially considering her traumatic past. *Id.* Though the asylum officer issued a negative decision, Ms. Reyes presented her case to an Immigration Judge and the Judge found that Ms. Reyes has a Reasonable Fear of returning to Honduras. Lerman Decl., Exhibit 9. At the hearing on November 6, 2025, the Immigration Judge informed Ms. Reyes that she would soon be scheduled for her withholding only proceedings at the Immigration Court. *Id.* at para. 20. However, Ms. Reyes was not scheduled for Withholding Only proceedings until after this Petition for a Writ of Habeas Corpus was filed. *Id.* at Exhibit 10.

While waiting for her Withholding Only proceedings to be scheduled, Ms. Reyes remained detained at CCJ. The conditions at the facility were extremely difficult. Ms. Reyes describes being fed inedible food and losing 10 pounds over the course of her detention. Reyes Decl. para. 19. Ms. Reyes was given dirty underwear, clothing that was far too large, and had to use her own money to purchase a coat. *Id.* at 20. Ms. Reyes describes experiencing worsening symptoms of her diagnosed Post Traumatic Stress Disorder ("PTSD") and not receiving adequate mental health care. *Id.* at 16. Ms. Reyes was subjected to a re-traumatizing experience when a man exposed himself to her and she received no protection from the jail staff. *Id.* at 17. She faced ridicule and verbal abuse from guards and other individuals detained there, with guards telling her "you guys are nothing" and using vulgar language towards her. *Id.* at 18. Ms. Reyes also did not receive adequate medical care and to date is still suffering from a serious and untreated injury she sustained at CCJ. *Id.* at 21-22, 42.

Ms. Reyes described receiving only two sets of documents from ICE while detained there: one was the decision from the asylum officer, and the other seems to be a custody review determination. *Id.* at 14. Ms. Reyes' attorney describes not having received any notice from ICE before the custody review took place or notice of any decision. Lerman Decl. para 4.

On January 22, 2026, Ms. Reyes was suddenly transferred out of CCJ along with all of the jail's ICE detainee population. *Id.* at 24. That evening, jail officials began yelling at Ms. Reyes and the other ICE detainees that they needed them to get out and that the jail officials no longer wanted them there. *Id.* at 25. Ms. Reyes was taken to the ICE/ERO field office in Burlington, MA, where a treacherous and horrific journey unfolded.

On the drive from CCJ to Burlington, ICE officials turned the heat up high in the transport van, so much so that a woman fainted. *Id.* at 26. Despite Ms. Reyes' and the other women's screams for the officials to stop the car and help this woman, ICE officials just kept driving. *Id.* Once they arrived at the Burlington office, the women were stuffed into a small room that was already full with people. *Id.* at 27. Ms. Reyes estimates around 75 women inside this small space. *Id.* There was not even enough space for everyone to sit, so Ms. Reyes had to switch off sitting and standing with the other women there. *Id.* There was only one, exposed toilet for all 75 women. *Id.* at 28.

The room also had the heat turned up high. The heat and the large concentration of people made the situation unbearable. The women in the room began suffocating from heat, but the ICE officials did nothing to help. *Id.* When a woman with epilepsy fainted and two more followed, the officials at first said "I don't care" and then took minutes to open the door and provide any sort of aid to the ill individuals. *Id.* Ms. Reyes and others kept pleading with the ICE officers to leave the door open because people were suffocating, but the officials just stated that

they "can't open the door" and threatened that if the women didn't shut up, they would have serious problems. *Id.* at 30. Ms. Reyes didn't sleep the whole night, and explains how she did not imagine anything like this mistreatment could happen in the United States. *Id.* at 31.

In the morning, Ms. Reyes was given only a bottle of water and then once again placed in three-point restraints (handcuffs on wrists and chains on waist and feet). *Id.* at 33. Many of the women were crying and requested to speak to their family or their lawyers, but ICE officials told the women that they did not have the right to talk with their lawyers. *Id.*

Ms. Reyes was loaded onto a bus that, once again, had the heat turned up high. *Id.* at 34. Ms. Reyes was then forced to wait on the bus for around 3 ½ hours. *Id.* They were then led onto the plane, still in chains, where they were forced to wait an additional hour before taking off. *Id.* Ms. Reyes had not been allowed to use the bathroom, nor had anyone else who was detained on the flight. *Id.* One woman got so sick that she started vomiting blood, but ICE still refused to take off her chains until a lot later. *Id.* at 35. Finally, after they had been in the air for 3 hours, Ms. Reyes was allowed to use the bathroom. *Id.* at 36. Upon arrival to Louisiana and getting off the plane, Ms. Reyes vomited *Id.* at 37. By then, the only food she had been given all day was a bottle of water and an apple. *Id.*

Ms. Reyes finally arrived at the South Louisiana ICE Processing Center, but the conditions there have also proven to be quite challenging. *Id.* at 39. Her first night there, Ms. Reyes was left to sleep on the floor of the shower. *Id.* at 39. The cells are, once again, kept extremely hot. *Id.* at 40. The water often gets shut off for long periods of the day, and brown water comes out from the sink. *Id.* at 43. Furthermore, Ms. Reyes is still suffering severe pain from the fall she had at CCJ, and to date, has not seen a doctor or medical provider. *Id.* at 42.

Though she requested to continue receiving the two medications she had been taking at CCJ, she has not received any medication yet, despite being in immense pain. *Id.*

Ms. Reyes recounts how her PTSD symptoms have been exacerbated by her ongoing detention, and how this recent transfer and the associated events have only added to her anxiety and distress. *Id.* at 15. She describes how her main wish is to be back with her children, to be able to care for her son with special needs, and to be able to continue to pursue her fear claim in Immigration Court in a calm and supportive setting. *Id.* at 46.

## II.  JURISDICTION

Notably, Respondents do not challenge the Court's jurisdiction over the Petition, nor could they. Resp. Opp. at 3. Ms. Reyes' Petition was filed in this Court after Ms Reyes' immigration counsel took every reasonable step to confirm that Ms. Reyes was confined in Massachusetts. Ms Reyes' counsel attempted to contact ICE numerous times to confirm Ms. Reyes' location prior to filing the Petition but her efforts were in vain. In fact, counsel contacted ICE in December 2025 and requested advance notice of any potential transfer from the facility where Ms. Reyes was detained, but never received any response. Lerman Decl., Exhibit 2.  After hearing from Ms. Reyes and her family about a potential impending transfer on the evening of January 22, 2026, counsel called and sent numerous emails to ICE, but did not receive any response to those inquiries. Lerman Decl. at paras. 6, 9-10, 13 & Exhibits 3, 5-7. After filing the Petition, counsel learned that ICE had put Ms. Reyes on a plane to Louisiana, and, as Respondents state, she was in the air at the time the Petition was filed. Resp. Opp. at 2-3 (ECF No. 8).

The "general rule" is that a petitioner must file a habeas petition in the district in which they are confined and must name as a respondent the petitioner's immediate custodian. *Rumsfeld*

6

*v. Padilla*, 542 U.S. 426, 442-47 (2004); *see also Van Tran v. Hyde*, Civil Action No. 25-cv-12546 -ADB, 2025 WL 3171210 (D. Mass. Nov. 13, 2025) (Burroughs, J.). There are important exceptions to these rules noted by the Supreme Court in *Padilla*. Relevant to this case, the *Padilla* Court stated that "when … a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 450, n. 18. *See Van Tran*, 2025 WL 3171210, \*3 (quoting *Demanjuk v. Meese*, 784 F.2d 1114, 1115-16 (D.C. Cir. 1986) ("it is essential that petitioner not be denied the right to petition for a writ of habeas corpus.")

As noted by Respondents, this Court has already found in *Moreira Aguiar v. Moniz*, No. 25-cv-12706-IT, 2025 WL 2987656, at \*1-3 (D. Mass. Oct. 22, 2025) that the Court has habeas jurisdiction even where - just as here - the petitioner is on a plane leaving the district at the time the petition is filed. The Court's decision in *Moreira Aguiar* is consistent with *Van Tran v. Hyde*, 2025 WL 3171210, among other decisions. Just as in *Van Tran* where the petitioner was in the air being transferred by ICE out of Massachusetts at the time the petition was filed in this District, Ms. Reyes' counsel filed "the Petition in the only location that made sense in the moment," *Van Tran*, 2025 WL 3171210, \*3, which was here in this District where she last knew Petitioner to be. *See* Lerman Decl. at para. 12. For these reasons, the Court has jurisdiction over the Petition.[2]

---

[2] At the outset, Respondents suggest that they detained Ms. Reyes and are entitled to keep her in custody simply because she has a final order of removal. Resp. Opp. at 3-4, citing 8 U.S.C. § 1231(a)(6). However, Respondents ignore that there are many instances where habeas relief is appropriate and has been granted for individuals with a final order. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678 (2001) (addressing detention for individuals post-final order). Moreover, as discussed below, Respondents are not entitled to detain Ms. Reyes while violating her constitutional rights on multiple grounds. At a minimum, that Ms. Reyes has a final order does not moot her habeas claims or deprive the Court of jurisdiction to grant this Petition.

### III. ARGUMENT: THE COURT SHOULD ORDER PETITIONER'S IMMEDIATE RELEASE AND GRANT THE PETITION ON THE MERITS

#### A. The Appalling, Degrading, and Inhumane Detention Conditions That Respondents Have Subjected Petitioner To Violate Petitioner's Rights To Substantive Due Process

From the beginning of Ms. Reyes' custody by ICE in September 2025, ICE has subjected Ms. Reyes to appalling, degrading, and inhumane conditions of confinement. These conditions have violated and continue to violate Ms. Reyes' rights to substantive due process. On this basis alone, the Petition should be granted and Ms. Reyes' ordered immediately released from custody.

The Due Process clause is intended to prevent the government "from abusing [its] power, employing it as an instrument of oppression." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *see also Daniels v. Williams.* 474 U.S. 327, 331 (1986) ("to secure the individual from the arbitrary exercise of the power of government" and "to prevent governmental power from being 'used for purposes of oppression'") (internal citations omitted); *Parratt v. Taylor*, 451 U.S. 527, 549 (1981) (Powell, J., concurring) (due process is intended to prevent the "affirmative abuse of power").

In *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 199-200 (1989), the Supreme Court stated that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and well-being." According to the Court:.

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e. g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble*. supra. at 103-104; *Youngberg v. Romeo*, supra. at 315-316. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on

his own behalf. *See Estelle v. Gamble*, supra. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause.

*Id.* at 200.

These Constitutional principles apply equally to immigrant detainees in civil custody. *See, e.g., Savino, supra; Coreas v. Bounds*, 451 F. Supp.3d 407, 419 (D. Md. 2020) ("a claim by an immigration detainee seeking release because of unconstitutional conditions or treatment is cognizable under [section] 2241") (citing *Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001); *Miller v. United States*, 564 F.2d 103, 106 (1st Cir. 1977) ("Section 2241 provides a remedy for a federal prisoner who contests the conditions of his confinement"); *Hernandez v. Kolitwenzew*, Case No. 20-cv-2088-SLD, 2020 U.S. Dist. LEXIS 97874, *22 (C.D. Ill. 2020) ("[w]henever the government detains or incarcerates someone, it has an affirmative duty to provide conditions of reasonable health and safety").

It is well-established that conditions of confinement for civil immigration detainees can support habeas relief where, as here, those conditions violate constitutional standards. *See, e.g., Savino v. Souza*, 453 F. Supp. 3d 441, 450 (D. Mass. 2020) (Young, J.) (addressing unconstitutional conditions for immigrant detainees in the context of the COVID-19 pandemic). In *Savino*, Judge Young summarized the "deliberate indifference" standard as follows:

The due process guarantee of the Constitution obliges the government "to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health." *Coscia v. Town of Pembroke,* 659 F.3d 37, 39 (1st Cir. 2011) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77, L. Ed. 2d 605 (1983) & *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "Proof of

9

deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm," *id*. (citing *Farmer*, 511 U.S. at 835), "and it may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate," *id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." *Leite v. Bergeron*, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018) (further citation and internal quotation marks omitted). "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." *Id.* at 53 (quoting *Giroux v. Somerset Cty.*, 178 F.3d 28, 32 (1st Cir. 1999)). Courts generally apply the same standard for civil immigration detainees as for pre-trial detainees. *See E. D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the legal rights of an immigration detainee [are] analogous to those of a pretrial detainee" and collecting cases of other circuits).

*Savino*, 453 F. Supp. 3d at 450-451. *See also Hernandez*, 2020 U.S. Dist. LEXIS 97874, *23 (civil detainees are protected "from harm caused by a defendant's deliberate indifference to the detainee's safety and health") (internal quotations and citation omitted).

A civil detainee may also establish a constitutional violation based on conditions of confinement if they can "demonstrate that their conditions of confinement 'amount to punishment of the detainee.'" *Engelund v. Doll*, No. 4:20-CV-00604, 2020 U.S. Dist. LEXIS 72353, *20 (M.D. Pa. April 24, 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Civil detainees "are 'entitled to more considerate treatment than a criminal detainee, whose conditions of confinement are designed to punish.'" *Yanes v. Martin*, 464 F. Supp.3d 467, 470 (D.R.I. 2020). "They are entitled, as a matter of substantive due process, to 'safe conditions of confinement,' and the government is obligated 'to provide reasonable safety for all residents and personnel within the institution.'" *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).

10

"To determine whether a conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [the Court] may infer that the purpose of the governmental action is [unconstitutional] punishment.'" *Id.* (quoting *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotations omitted); *see also da Silva Medeiros v. Martin*, 458 F. Supp.3d 122, 127 (D.R.I. 2020) (finding petitioners had met their burden, including in light of balancing hardships and weighing the public interest, based on "their underlying medical conditions increasing their risk of severe complications from COVID-19"); *Yanes*, 464 F. Supp.3d at 470 ("[C]ivil immigration detainees can establish a due process violation by showing that a government official 'knew, or should have known of a condition that posed an excessive risk to health and failed to take appropriate action.") (internal quotations and citations omitted).

Here, the conditions that ICE has subjected Ms. Reyes to constitute both unconstitutional punishment *and* represent deliberate indifference. The conditions Ms. Reyes has experienced, from the Cumberland County Jail in Portland, ME to the Boston ICE/ERO Field Office in Burlington, MA to the South Louisiana ICE Processing Facility, could not possibly serve any legitimate or rational governmental objective. There can be no rational basis for refusing to provide medical treatment when required, withholding medications, forcing a civil detainee to sleep in the cold without adequate bedding, placing a detainee in a holding cell meant to be used for more than 12 hours with so many other women that there isn't room for everyone to sit down through the night much less lie down causing multiple women to faint from the conditions, depriving a civil detainee of adequate food, or keeping a civil detainee locked in jail housing without access to a toilet for hours on end. Ms. Reyes has experienced all of these things and more. Reyes Decl. at paras. 16-45. The conditions are not only punishing, but they establish a

11

deliberate indifference by ICE to the well-being of Ms. Reyes that goes far beyond basic negligence. ICE's detention tactics are intended to force detainees to give up their cases.[3] At a minimum, Ms. Reyes has been subjected to "objectively unreasonable" conditions that amount to a constitutional violation. *See Hernandez*, 2020 U.S. Dist. LEXIS 97874, *23-24. More accurately, however, Ms. Reyes unequivocally has been subjected to cruel, degrading, and inhumane conditions of confinement constituting a clear violation of her substantive rights to due process.

The government has no valid justification for perpetuating the conditions to which it has exposed and is continuing to expose Ms. Reyes. Moreover, there is no arguable public interest in keeping Ms. Reyes in custody. She can readily attend her Immigration Court proceedings while not detained. She has dedicated *pro bono* counsel representing her on the merits, and she attests to her full intention to appear in Court as required. Ms. Reyes' case will not be resolved for quite some time. It is likely that the Immigration Court will not adjudicate her claims for protection for months, and if there is an appeal, it will likely take six months or more for the appeal to be

---

[3] *See, e.g.,* Peleg, The New Yorker, "The Cruel Conditions of ICE's Mojave Desert Detention Center" (Jan. 28, 2026, *publicly available at* https://www.newyorker.com/news/the-lede/the-cruel-conditions-of-ices-mojave-desert-detention-center (last accessed on Jan. 30, 2026) ("But staffing issues do not fully explain the lack of basic medical care at California City. 'They do it so you give up,' Julio Cesar Santos Avalos, who was a detainee at California City from September to November, told me. When he arrived at C.C.D.F., Santos Avalos recalls a consistent push by staff for detainees to sign away their rights and self-deport. Instructions for how to self-deport are displayed prominently near phones where detainees communicate with their lawyers. Santos Avalos and many of the detainees and attorneys I spoke to believe the lack of medical care is part of that push. The detention center is aiming to make conditions so terrible that detainees stop fighting and decide to leave. Santos Avalos, who suffers from chronic pain owing to a foot deformity caused by childhood cases of polio and Guillain-Barré syndrome, was denied his pain medication and made to sleep on a top bunk until he broke under the pressure and self-deported to El Salvador."); Gassama, ACLU, "Detained Immigrants Detail Physical Abuse and Inhumane Conditions At Largest Immigration Detention Center in the U.S.," (Jan. 26, 2026), *publicly available at* https://www.aclu.org/news/immigrants-rights/detained-immigrants-detail-physical-abuse-and-inhumane-conditions-at-largest-immigration-detention-center-in-the-u-s (last accessed on Jan. 30, 2026) ("Human rights organizations, including the ACLU, sent a letter Monday to U.S. Immigration Customs and Enforcement (ICE) detailing accounts of violent assaults and sexual abuse by officers. It also reveals details of other forms of intimidation used to pressure detained immigrants into self-deporting or agreeing to removal to third countries where they have no ties.")

resolved if Ms. Reyes remains detained. Accordingly, Ms. Reyes could easily experience a year or more of detention before her case is concluded. *See* Lerman Decl. at para. 25.

Respondents do not acknowledge or address the appalling conditions at the Boston ICE/ERO Field Office in Burlington, MA or the inexcusable treatment of the women as they were moved from Burlington to Louisiana. *See* Reyes Decl. at paras. 27-38. Respondents simply point out that Petitioner is no longer at the ICE/ERO Field Office in Burlington, MA. Resp. Opp. at 2-3. However, Respondents should not be rewarded for having transferred Petitioner to a different facility, now in Louisiana where the civil detention conditions remain shocking. *See, supra.* ICE has subjected Ms. Reyes to degrading, inhumane treatment since she was first detained by ICE in September 2025.

Respondents focus their brief opposition on the argument that they are constitutionally entitled to detain Ms. Reyes because she has a final order of removal. Resp. Opp. at 4-5. But that misses the point. Respondents are not entitled to detain Ms. Reyes in conditions that violate her constitutional rights. For the reasons stated above, this Court has authority to order Ms. Reyes' immediate release regardless of her immigration status. On the basis of conditions of confinement alone, the Petition should be granted and the Court should order Ms. Reyes' immediate release. *See, e.g., Hernandez*, 2020 U.S. Dist. LEXIS 97874, *3 (granting petition based on conditions and ordering immediate release); *da Silva Medeiros*, 458 F. Supp. 3d at 130 (granting immediate release and waiving bond requirement).

### B. <u>Respondent's Failure to Commence Petitioner's Withholding-Only Proceedings For Close to Three Months Until Ms. Reyes Was Forced To File This Petition Violates Petitioner's Rights to Due Process</u>

An Immigration Judge in the Chelmsford Immigration Court concluded on November 6, 2025 that Ms. Reyes has reasonable fear of returning to Honduras. Lerman Decl, Exhibit 9. The IJ's conclusion should have immediately led DHS to commence withholding-only proceedings

13

for Ms. Reyes in the Chelmsford Immigration Court by filing Form I-863 (DHS Notice of Referral to IJ).[4] Instead, DHS did nothing. They continued to hold Ms. Reyes in custody in appalling detention conditions. Respondents suggest that this, like the conditions Ms. Reyes has been subject to, is also a non-issue, because now – since she filed her habeas petition, DHS has commenced withholding only proceedings and Ms. Reyes is set for a hearing in the Chelmsford Immigration Court for February 5, 2026. *See* Lerman Decl. at para. 22, Exhibit 11. However, Ms. Reyes is now detained in Basile, Louisiana, and there is no indication that ICE will return her to New England for her hearings in the Chelmsford Immigration Court. In accordance with recent policy set by the Executive Office for Immigration Review ("EOIR"), the Immigration Judge will likely simply *sua sponte* transfer Ms. Reyes' case to the San Juan Immigration Court in Puerto Rico (which hears for individuals detained in Basile, LA), far from where her *pro bono* counsel works and where Petitioner's other resources and supporters reside.[5]

This is prejudicial to Ms. Reyes for numerous reasons. First, Ms. Reyes is far from her *pro bono* counsel Rachel Amelia Lerman who works in Connecticut where Ms. Reyes had been living prior to her detention. Attorney Lerman does not have the resources to travel to Louisiana to meet with Ms. Reyes in person. It has been difficult for Attorney Lerman to schedule legal phone calls with Ms. Reyes. It took a week to schedule one legal phone call. Lerman Decl. at para. 23-24. It is also challenging to work with a client solely from a distance who has PTSD

---

[4] While the regulations are vague as to how withholding proceedings are commenced following an IJ finding reasonable fear (*see* § 1208.31), it is understood in practice that proceedings begin, following a reasonable fear finding, when DHS files Form I-863. In this case, DHS filed Ms. Reyes' Form I-863 on January 28, 2026 *after* she filed her Petition. *See* Lerman Decl., Exhibit 10.

[5] *See* Owen, Department of Justice, "CANCELLATION OF OPERATING POLICIES AND PROCEDURES MEMORANDUM 18-01" (Apr. 25, 2025), *publicly available at* https://iptp-production.s3.amazonaws.com/media/documents/2025.04.25_EOIR_-_PM_25-30.pdf (last accessed Jan. 30, 2026) (stating that despite change of venue requirements, Immigration Judges are administratively authorized to perform "clerical transfers" of cases from one Immigration Court to another).

symptoms and trauma. *Id.* at para. 26. Ms. Reyes is also far from her family, from the medical and psychological evaluators who are working on her case, along with her community supports.

That Ms. Reyes had to spend almost three extra months in custody, enduring inhumane detention conditions, just waiting for Respondents to commence her Immigration Court proceedings, violates her procedural rights to due process in that she has had to remain confined in jail - deprived of her liberty - for three months for no legal basis whatsoever. *See, e.g., Deshaney*, 489 U.S. at 199-200; *Culombe v. Connecticut*, 367 U.S. 568, 599-600 (1961) (prompt appearance before a magistrate "essential to the protection of personal liberty"); *United States v. Tejada*, 255 F.3d 1, 4 & n.6 (1st Cir. 2001) (recognizing delay in presenting arrestee to magistrate judge may "effect[] a constitutional deprivation"); *Corley v. United States*, 556 U.S. 303, 306 (2009) (requirement of prompt initial appearance intended to prevent "secret detention" by the government); *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975) (Fourth Amendment requires judicial determination of probable cause after warrantless arrest); *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998) ("The first appearance [on civil body attachment warrant] has such great value in protecting numerous rights that its denial presumptively disrupts those rights. Therefore, as a matter of constitutional prophylaxis, the denial of a first appearance offends the Due Process Clause."); *Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218 (S.D. Cal. 2019) (substantive and procedural due process require prompt presentment in immigration context).

Even worse, just prior to Respondents finally commencing the withholding-only proceedings in the Chelmsford Immigration Court, Respondents abruptly transferred Ms. Reyes out of New England so that she is no longer even in the jurisdiction of the Chelmsford court. By quickly commencing proceedings after the Petition was filed, Respondents appear to have

15

conceded the violation. Yet, their haphazard attempt to correct Ms. Reyes' baseless deprivation of liberty in violation of due process is not sufficient.[6]

### C. Respondent's Failure To Provide Notice of A 90-Day Custody Review For Ms. Reyes Violates Both The *Accardi* Doctrine And Ms. Reyes' Right To Procedural Due Process

Respondents suggest in their Opposition that since Ms. Reyes has a final order of removal, they can hold her in detention for that reason alone. Resp. Opp. at 1. However, in keeping Ms. Reyes in post-order detention, DHS is required to adhere to its own regulations and it has failed to do so. The regulations require ICE to conduct a 90-day custody review to determine if custody should continue. Specifically, 8 C.F.R. § 241.4(h) (2) and (d)(3) provide that the alien and his or her attorney must be given written notice approximately 30 days in advance of a custody review by ICE to determine whether detention should continue, so that the alien can submit information to support a request for his or her release. *Id.* § 241.4 (d) (3), (h) (2). *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 648 (D. Mass. 2018) (Wolf, J.). Ms. Reyes' counsel received no such notice, nor did she receive a copy of the decision, in violation of the regulations. Lerman Decl. para. 4. Respondents ignore this point in their opposition.

"When the INS published 8 C.F.R. § 241.4 on December 21, 2000, it explained that the regulation was intended to provide aliens procedural due process, stating that § 241.4 has the procedural mechanisms that ... courts have sustained against due process challenges." *Detention of Aliens Ordered Removed*, 65 F.R. 80281–01, at 80283 (2000) (internal quotations omitted).

---

[6] In addition, DHS's conduct is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C §§ 706(1), (2)(A)-((D).

*Jimenez*, 317 F. Supp. 3d at 641. It held that a process by which "Directors simply relied on the aliens' past criminal history and the fact that they were facing removal from the United States" to "summarily conclude[e] that the aliens posed such risks and deny[ ] them release," was "not satisfactory and d[id] not afford due process." *Jimenez*, 317 F. Supp. 3d at 641 (citing *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 399 (3d Cir. 1999)), *amended* (Dec. 30, 1999). The procedures in § 241.4, therefore, are not meant merely to "facilitate internal agency housekeeping, but rather afford important and imperative procedural safeguards to detainees." *Bonitto v. ICE*, 547 F. Supp.2d 747, 757–58 (S.D. Tex. 2008). They protect the fundamental Fifth Amendment right to notice and an opportunity to be heard and must be followed. *Jimenez*, 317 F. Supp. 3d at 642. In cases where ICE has already demonstrated an inability to perform lawfully and to decide fairly whether detention is justified, this Court has found that simply allowing ICE to conduct a new custody review is not a sufficient remedy. *Id.* at 656.

The *Accardi* doctrine holds that federal agencies must follow their own binding regulations and formally established procedures, even if those procedures provide greater rights than required by statute. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). *See also Service v. Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959). "Once an agency chooses to promulgate such rules, it must adhere to them to ensure a fair administrative process." *N-N- v. McShane*, Case No. 25-cv-05494-KNS, 2025 WL 3143594, *4 (E.D. Pa. Nov. 10, 2025). While the *Accardi* doctrine may require a showing of prejudice when an agency's failure to follow its regulations does not implicate "important procedural benefits" impacting individual rights and liberties, *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970); *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 178-79 (3d Cir. 2010) ("[W]hen an agency promulgates a regulation protecting fundamental statutory or constitutional

17

rights of parties appearing before it, the agency must comply with that regulation."), Petitioner has clearly suffered prejudice here. Ms. Reyes was entitled to a 90-day custody review during which her attorney could present evidence to ICE to establish that Ms. Reyes merits release. However, she was deprived of that important opportunity. For this reason alone, the Court should order Ms. Reyes' immediate release[7]

## IV.   CONCLUSION

For all the foregoing reasons, Petitioner Sonia Yamileth Reyes Arauz respectfully requests that the Court order her immediate release and grant her Petition.

Respectfully submitted,

SONIA YAMILETH REYES ARAUZ

By her counsel,

*/s/ Irene C. Freidel*
Irene C. Freidel
BBO# 559051
Political Asylum/Immigration
Representation (PAIR) Project
98 N. Washington Street, Suite 106
Boston, MA 02114
ifreidel@pairproject.org
(617) 420-3195

Rachel Amelia Lerman
*Pro Hac Vice to be filed*
AZ State Bar No. 036137
Medical-Legal Partnership Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 903-1505
rachel.lerman@yale.edu

Dated: January 30, 2026                          *Pro bono counsel for Petitioner*

---

[7] In addition, DHS's conduct in failing to follow its own rules is arbitrary and capricious in violation of the APA.

**<u>Certificate of Service</u>**

I hereby certify that I caused the foregoing reply memorandum to be served on Respondents' counsel on this 30th day of January, 2026 via the CM/ECF platform.


*/s/ Irene C. Freidel*
Irene C. Freidel
